and Wal-Mart. Good luck to our students. All right, Mr. Rothman, you have reserved four minutes for rebuttal. Good morning, Your Honors. Joel Rothman and Rachel Kamenetsky of SRIP Law, on behalf of the IP owners in this case, who are Turkey Merck, Cindy Chin, Omnia Studios, and Colisee Businesses, there are four types of claims here. Three of my clients have claims for copyright infringement related to product design, and one, Chin, has claims related to trademark, specifically her name and her signature that's on all her products. They're all creative businesses and they're all small businesses that depend upon sales online for their livelihood and who were all damaged by counterfeit goods sold on Wal-Mart that used their intellectual or they're facilitating the sale of counterfeit goods with knowledge of them being counterfeit or having a reasonable basis to believe they're counterfeit. I guess I want to make sure I understand your theory as to liability. So, Your Honor, with respect to trademark, Chin's claims, what's required is that the marks be used in commerce, and they were used in listings, in advertising. They were all shown in all of the listings. Were they used by Wal-Mart? They were used on Wal-Mart.com, and they were placed there by JD, who was a seller, signed seller agreements, who was Wal-Mart a seller? Wal-Mart was not the seller. Wal-Mart was providing the service in the way that Amazon or eBay did, Your Honor's decision in the eBay, Tiffany v. eBay case. So so I should tell you ahead of time that I'm also wrong. Please go ahead. Well, as applied to these facts, they're very, very different cases because what happens here is that unlike the Tiffany case where there was a lot of resale of authentic goods, here there was sale of counterfeit goods on a massive scale where Wal-Mart was put on notice by each of the plaintiffs of counterfeit goods being sold. They were taken down and put back up again, taken down and put back up again, and no consequences followed that. That suggests that Wal-Mart was trying to stop it, taking these things down as soon as a complaint was made? It does suggest that Wal-Mart was trying. However, what's necessary in order Wal-Mart even suspended J.D.'s counts a number of times. They suspended, according to the deposition, over a four-year period. They suspended them once in an errata. The deponent said no. It was actually twice for a 24-hour period of time. But that was the only consequence when, in fact, the facts before the case report showed that there were tens of thousands of complaints. Don't the cases recognize that we don't require perfection in these types of situations? It absolutely does provide that, Your Honor. However, from the trademark standpoint, the Omega case, from a copyright standpoint, Your Honor's recent decisions in McLuckin, those cases show that if you fail on McLuckin for copyright to reasonably implement a repeat infringer policy, which Wal-Mart did not, and if you cast a blind eye, which are the words of Omega, and you engage in willful blindness to what the infringers are doing, that leads potentially to liability. In fact, the district court below switched the burdens on those issues, placed the burdens on my clients to demonstrate that the defendants were not entitled to these defenses. And that, in and of itself, on de novo review, requires reversal here. The facts — many facts are actually not disputed as between both sides, including that the fact that there's a retailer agreement that's been signed, that J.D. exercised control, that Wal-Mart implemented brand gating, it had the power and exercised the power to stop thousands of brands being posted. That sort of activity, from a copyright standpoint, under the McLuckin decision — Your Honor, my time is up. May I respond to the question? Thank you. Thank you, Your Honor. So the law provides that the company that owns the marketplace, in this case Wal-Mart, that they need to do a few things. From a copyright standpoint, they need to reasonably implement the repeat infringement policy. But the facts are disputed on whether they did or not. And so that's one reason for three of the IP owners here why summary judgment should not have been entered for Wal-Mart. As to trademark, they need to do something more than simply ignore it. And that's the Omega decision. They can't simply cast a blind eye to it. They have to, upon receiving notice of it, act and do something to prevent it. And there's really no difference between this case and the case from the Northern District of California, which we cite in our reply brief, which was never disclosed to us, which was the Russell v. Wal-Mart case, where the facts are identical, and yet Wal-Mart, for the same repeat infringement policy for the same period of time, was found liable in that case. Thank you, Your Honor. I've reserved time for rebuttal. Yes. Thank you. So, Mr. Ellis, you're going to argue on behalf of Wal-Mart. Is that correct? Correct, Your Honor. Yes. Good morning, Your Honors, and I please the Court. Jonathan Ellis here on behalf of the Wal-Mart defendants. So I do think the claims against Wal-Mart are straightforward. As you heard my friend say, there's actually very little in dispute as far as the facts go. The evidence points all in the same direction. And I think, importantly, from Wal-Mart's perspective, the resolution of the claims against Wal-Mart don't turn on the proper characterization of the J.D. marketplaces on the Wal-Mart marketplace. The facts are, the undisputed ones, that Wal-Mart didn't create or control the listings in these cases, that when we were notified of the alleged infringement on the J.D. marketplaces, we took those listings down expeditiously, between one to two days on average. The argument seems to be that Wal-Mart didn't do enough. That's correct. And that there is an issue of fact as to whether Wal-Mart did enough. Right. Why isn't that right? Because it's not an issue of fact. There's an argument about the law and about whether Wal-Mart's actions were reasonable here. Everyone agrees that the listings were taken down expeditiously. What the complaint is, to your point, Your Honor, is that we didn't either prevent reposting of those listings or that we didn't terminate J.D.'s accounts. As to the first, this Court has held in Vimeo 1 and Vimeo 2 and 512M of the DMCA says as much, that service providers are not under an obligation to monitor for infringement, to find the facts. We have to act when we get knowledge. We did. And as to the claim about repeat infringement, the facts are that the rate of infringement on the J.D. marketplaces was exceedingly low. And so my friend points to thousands and thousands of listings over a four-year period that they say were infringing. But there are thousands and thousands of listings on the J.D. marketplaces every single day. And if you look at the rate of claimed infringement on those marketplaces compared to the sales, it is exceedingly low. I'm not going to say the number because it's sealed in here in open court, but you can see it in the Snooks Declaration, the sealed supplemental appendix at page 16. The point, the most important point is that the rate of infringement on these marketplaces was lower than other marketplaces on walmart.com and lower than direct sellers on walmart.com. So I think it would have been unreasonable for Walmart in response to that low, low rate of infringement to terminate the accounts. It's not as if we did nothing. Just contrary to my friend's arguments this morning, we took down the listings. You can see it in the Boychuk exhibits. You can see it in the Snooks exhibits. They came down very quickly. And when we were alerted to them, and we're just not under an obligation to go to monitor and find additional infringement, we respond. That's the balance that Congress has struck in the DMCA. The court described it well, I think, in the Vimeo 2 decision, that these online service providers, these online marketplaces, they enable vast amounts of lawful conduct. There's no dispute that that's what happened here. And the DMCA has set up a balance. Congress has struck a balance as to when we're going to hold these marketplaces responsible for other people's infringement or alleged infringement. And if my friends have a complaint about where that balance is struck, this Court has said multiple times that's a complaint that should be directed to Congress. And I do think the Supreme Court's case decision in Cox from a couple weeks ago only confirms that point. I'll say a word about the Russell decision. My friend points to it in his reply brief. That is a decision that is, in fact, not on all fours. The shipper there was a drop ship vendor. And so there was arguments and allegations on the case that the jury accepted, that Walmart actually took control. What's a drop ship? Drop ship vendor. And so it's just a different relationship that Walmart has with some of its vendors. And the arguments and evidence there, we disputed it, of course. What is it? What is it? Drop ship. So we, the listing is created by the vendor, but then we take control of the sale. That's the arguments anyways. And the shipment. The sold and shipped by label that they make a lot of in their brief said sold and shipped by Walmart in the Russell case. And actually in the C.D. Cowell Russell case about the DMCA. Even here, Walmart didn't take any control of any of the shipments. Correct. There's no evidence. That's correct. We were a platform, passive activities. And that leads to the last thing I'd love to just touch on for a moment. My friends argue in the supplemental brief that there is a direct infringement claim against Walmart in this case. And that's why Cox is not dispositive of the claims against, copyright claims against Walmart. As to that, I just don't think that's a plausible reading of the record. Of course, this brief says as much on page 58 that the claims against Walmart are contributory infringement. But I'd also point the court to the motion for summary judgment in the Omnia case, but they're all pretty much the same. That's docket 111-2 where the court or the plaintiff say the case against Walmart is based on contributory liability. And they said as much as the same thing in the consolidated opposition to our motion for summary judgment. That's Omnia docket 121. I'd point the court to page 8 and page 9. I just don't think there's any direct infringement case here. Nor could there be. There's no allegation or evidence of volitional conduct by Walmart. Thank you, Your Honor. All right. And now we'll hear from Ms. McKinley for J.D. Good morning. May it please the court? My name is Christina McKinley, and I represent who we've collectively referred to as the J.D. defendants. As it pertains to the J.D. defendants, the question before this court is straightforward. Did appellants present evidence sufficient to create a triable issue on the question of whether the J.D. defendants are service providers entitled to DMCA immunity? The answer is no. And I want to start with that question because that is critical here. As to the J.D. defendants, the only question that appellants raised was whether the J.D. defendants were a service provider on the one hand or a direct seller on the other. They did not contest the elements of DMCA immunity as it pertained to the J.D. defendants or otherwise suggest that the J.D. defendants were exempted from that immunity. So when the district court was looking at the evidence in front of it and whether that evidence created a triable issue, the only question was whether that evidence showed that there was a triable issue on the question of whether J.D. was in fact a service provider. The answer there is no. Well, J.D. is the seller, isn't it? No, it is not, and that's what the evidence showed. J.D. operates the Joy Buy marketplaces. The Joy Buy marketplaces are themselves a sub-marketplace. That sub-marketplace is a marketplace that provides a bridge between Wal-Mart's end users, the purchasers who are using Wal-Mart, and the direct sellers who are third parties entirely independent of J.D. So there are some references in the record to J.D. as the seller. Why doesn't that evidence create an issue of that? Yes, Judge Chen, I think that's an important question because the fact that there are a few and I think there are two references in two agreements or two documents to J.D. as a seller or a retailer, those are labels that result from Wal-Mart's default systems. So when a retailer, which is Wal-Mart's definition, agrees to use the Wal-Mart platform, Wal-Mart calls that party a retailer. That agreement is a default agreement. J.D. has no ability to change its terms. That is what the evidence of the record showed. And the retailer agreement defines a retailer broadly. It defines it as any entity that wants to use the Wal-Mart platform. It does not limit that entity to a seller. So the critical point for the district court was irrespective of labels, there was simply no evidence of any conduct, any conduct taken by J.D. that would make it a direct seller unentitled to DMCA immunity. That's the critical point and why there was no tribal issue of fact here. That information, I'm sorry, was all before the court? Yes, yes, Your Honor. I'm sorry, Judge Sullivan, did you have a question? I'm just looking at the statute, right? And so it talks about a service provider shall not be liable by reason of the storage at the direction of the user of material that resides on a system controlled by or for the service provider. So who's the user in this case? Under the statute, by direction of the user refers to the third-party sellers. So those are the entities in China, in this case, that were using the J.D. platforms, the Joy Buy marketplaces, to then sell on the Wal-Mart platform. The users are the third parties. And, again, there was no evidence in the record that J.D. had any control whatsoever over the content that those users put on the Joy Buy marketplaces. In fact, the evidence to the record was to the contrary. There's no dispute that the products in question, whether they were mugs or whatever, came from these third parties. That's correct, Your Honor. And Mr. … Were they shipped from the United States? Any of them are supposed to be shipped from abroad? I believe there was some inconclusive evidence in the record that at least some of the products might have been shipped from the United States. The district court didn't find that relevant because it didn't say. That evidence did not show who they were shipped from. It's my understanding that for a lot of these third-party sellers, let's say they're operating in China like they were here, a lot of them have warehouses in the United States because if they don't, then it would take an exorbitant amount of time to ship a product from China to the United States. So they might warehouse those products in the United States. But that evidence was not relevant because there was no evidence that said J.D., in fact, shipped those products. In fact, again, the evidence of record was to the contrary. There was no evidence that J.D. engaged in any conduct that would make it a direct seller as opposed to a passive marketplace. Also, wasn't there a statement, perhaps an error, but a statement by the in-house counsel suggesting that J.D. was a seller? No, Your Honor. Actually, there was a – I believe what you're referring to was there was a typo in our brief. We corrected that. When we pointed back to his declaration, if you look at his exact declaration, he says that the sales were made by the third parties. The third parties facilitated those sales. Not by Joybuy. That's correct. Joybuy was just a passive marketplace. Again, your point is that the definition of service provider decides this entire case because we don't even get to whether or not there's evidence or disputed issues of fact related to whether or not J.D. had actual knowledge of the infringing activity. As it pertains to Joybuy – or to J.D. operating the Joybuy marketplace, that's correct, Judge Sullivan, because that's the only question that appellants raised as to the J.D. defendants. I see my time has expired. If there are no further questions, I'll sit. Thank you. Thank you. Now we'll hear from Mr. Rothman for four minutes of rebuttal. Thank you, Your Honor. First, concerning the arguments of my friend on behalf of J.D., the marketplace in a marketplace is a Russian nesting doll. It continues potentially forever. Well, I guess that may be, I guess. But I first want to make sure I'm clear on this, which is that the only dispute with respect to J.D. was whether or not it is a service provider. Is that right? That is not correct. So explain to me why that, why Ms. McKinley is wrong about that. Because the premise for our motions for summary judgment and for our opposition to their motions for summary judgment were that there is no such thing as a marketplace in a marketplace, that instead, J.D., those companies signed agreements making them retailers and sellers. On pages 9 to 11 of our opening brief, we show that there are 23 different agreements that the J.D. defendants agreed to under which they are sellers. They are retailers. It's called the Walmart Retailer Agreement, and all of the addenda to them and all of the policies that J.D. agreed to to be a retailer were contractual arrangements they made with Walmart. So that, you're making the marketplace within a marketplace argument. The question was, did you make any other arguments below? We said, as we showed. Did you make any other arguments below besides the Russian doll argument? Right, that J.D. was the seller. They were selling. Right, but I guess that all implies, I think, that your argument was really about them not being a service provider. They are not. It goes to the alternative argument, which is that even if they are a service provider, they are nonetheless a knowing infringer. They are facilitating the infringement of somebody else, and so they are not subject to the safe harbor. Did you make that argument below? We didn't make the argument below, but on de novo review, we've made it in our briefs. And what we've said to Your Honors is that even if you accept the marketplace in the marketplace, what the evidence shows is that J.D. controlled the entire means and manner by which these listings were placed on Walmart. So you've just conceded that you didn't make the even if argument below. Why should we consider it now on appeal for the first time? Well, Your Honor, because the district court in Florida in the Royal Enamel case addressed the same issue. It rejected it. It said that there is no such thing as a marketplace in a marketplace. It's a fallacy. So we should review an argument that wasn't made below because a district court in Florida addressed the issue? No, Your Honor. Does that make any sense? No, it doesn't, Your Honor. And I'm not suggesting that. What I'm saying to Your Honor is that the argument that we're making here is one that Your Honors can accept because on de novo review, you have the ability on a summary judgment to decide the case based upon other issues, not just one.  I guess we do that. But it's just sort of odd to me that if you didn't contest one of the, you know, one of your theories of liability, in other words, you never said that they were direct infringers or that they were knowing infringers, then why are we going to be addressing that? Your Honor, my time is up. Can I respond to that? Yes. Because I don't think that what Your Honor is saying, that we didn't contest that they were knowing infringers, is really a truthful, accurate statement. Okay? Well, it's the second part of the test as to whether or not the safe harbor applies. Right. Even if you're a service provider, you don't get safe harbor protection if you're a knowing infringer or if you know that infringing is taking place. Right. If you are, you're completely aware of what's going on and you're facilitating it. Right. Absolutely. And what I'm saying to Your Honor is that they're, that J.D. being the seller, that being identified as the seller and having been the recipient of tens of thousands of takedowns and complaints about their activity, having been brand gated by Walmart because of over 3,000 different brand complaints against them, they had all the knowledge they needed in order to understand that their, what they call sub-sellers, that what their sub-sellers were doing in using the Chinese technology platform they built in China for Chinese sellers was infringement and counterfeiting on a massive scale. Okay. But again, it's just not clear to me if in the briefing for summary judgment there was a disputed issue of fact as to whether or not the knowledge of infringement component of the safe harbor was disputed. Right. I think you keep coming back to saying they were users, they were sellers, therefore they're not service providers. And that's a different animal. So was this teed up for the district court? The district court ignored the issue by going directly to the defense and switching the burdens. If the district court had looked at and cited, which it didn't, the papers we submitted, if the district court had seen the evidence of the repeated infringement that we've put in our briefs, it would have seen that there was no way that J.D. could be considered not only not a service provider, but that they could consider them to be completely without fault. They knew what was going on. They knew that they were being looked at as the seller on this marketplace. And so when the marketplace and the marketplace trope dissolves as it should, J.D. is a seller and it's responsible. All right. Well, thank you all. Thank you. Reserve decision.